# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF OHIO
## WESTERN DIVISION AT DAYTON

DOROTHY DUGAN,                          :

         Plaintiff,                  :

                                  Case No. 3:09CV0199

 vs.                                    :

                                  District Judge Thomas M. Rose

MICHAEL J. ASTRUE,                      :   Magistrate Judge Sharon L. Ovington
    Commissioner of the Social
    Security Administration,            :

         Defendant.                  :

# REPORT AND RECOMMENDATIONS[1]

## I.     INTRODUCTION

      Plaintiff Dorothy Dugan sought financial assistance from the Social

Security Administration by applying for Disability Insurance Benefits ["DIB"]

and Supplemental Security Income ["SSI"] on September 20, 2002, alleging

disability since February 25, 1999, due to chronic back problems, severe

depression, suicide attempt, memory loss, and bad nerves.  (Tr. 104, 739).

Because Plaintiff's prior applications for DIB and SSI alleging the same onset date

were denied on May 10, 2002 (*see* Tr. 45-63), the effective onset date for her

---

[1]Attached hereto is NOTICE to the parties regarding objections to this Report and
Recommendations.

current applications is May 11, 2002.  (*See* Doc. #10 at 1-2, n.1; *see also* Tr. 1114; Tr. 33, Finding #1).

   After various administrative proceedings, including a hearing at which Plaintiff testified on February 15, 2005 (Tr. 780-807), Administrative Law Judge ["ALJ"] Daniel R. Shell issued a decision on November 8, 2005, finding that Plaintiff was not disabled.  (Tr. 16-35).  That decision eventually became the final decision of the Social Security Administration (*see* Tr. 7), from which Plaintiff previously sought review in this Court.  *See Dugan v. Astrue*, No. 3:07cv0159 (S.D. Ohio Feb. 28, 2008) (Rice, J.); (Tr. 849-59).  This Court remanded the case for further proceedings, directing the ALJ to consider the effect of Plaintiff's limited neck movement on her ability to "look down" while working.  *Id.* at 9, 10; (Tr. 857, 858).

   On remand, a second administrative hearing was held on November 12, 2008.  (Tr. 1103-43).  In a decision dated December 19, 2008 (Tr. 814-35), ALJ Shell again denied Plaintiff's DIB and SSI applications, based on his conclusion that Plaintiff remains able to perform a significant number of jobs existing in the national economy.  (Tr. 833-34).  The ALJ's nondisability determination and the resulting denial of benefits later became the final decision of the Social Security

Administration.  (Tr. 808).  Such final decisions are subject to judicial review, *see* 42 U.S.C. § 405(g), which Plaintiff now is due.

This case is before the Court upon Plaintiff's Statement of Errors (Doc. #10); the Commissioner's Memorandum in Opposition (Doc. #15); Plaintiff's reply (Doc. #16); the administrative record; and the record as a whole.

Plaintiff seeks remand of the ALJ's decision to correct certain alleged errors.  The Commissioner seeks an Order affirming the ALJ's decision.

## II.    BACKGROUND

Plaintiff was 39 years old on the effective onset date of May 11, 2002 (Tr. 833), and thus was considered to be a "younger person" for purposes of resolving her DIB and SSI claims.  *See* 20 C.F.R. §§ 404.1563(c); 416.963(c).[2]  She has a tenth grade, "limited" education.  (Tr. 833, 32, 786); *see* 20 C.F.R. § 404.1564(b)(3).  Plaintiff has worked in the past as a machine operator and a fast food worker.  (Tr. 833; *see also* Tr. 31).

At the first hearing, Plaintiff testified that she last worked assembling computer components for an electronics manufacturer.  (Tr. 782-83).  Prior to that, she had worked "almost a year" as a machine operator (Tr. 783); handling pieces of wood for furniture assembly; as a cashier at McDonald's (Tr. 784); and

---

[2]Subsequent citations will identify only one set of the pertinent DIB or SSI Regulations, with full knowledge of the corresponding Regulations.

as a nursing assistant.  (Tr. 785-86).  She also had worked as a waitress.  (Tr. 798).

Several other jobs had been short term placements through temporary services.

(Tr. 783).  She completed the tenth grade, but had not succeeded in acquiring a

GED.  (Tr. 786).

      Plaintiff testified that she is unable to work due to "a lot of pain through

my back, my legs, my arms, my hands."  (*Id*.).  She said that the problems began

after she suffered an injury at work in February 1999, "[b]ut they didn't realize at

that time that it was as bad as it was."  (Tr. 788-89).  She had surgery on her neck

in 2002 for "bad dis[c] problems," which "just messed things up more."  (Tr. 786).

A fusion was performed, leaving her unable to rotate her head "even halfway to

my shoulder."  (Tr. 790-91).  She also is "very restricted [i]n looking down."  (Tr.

791).  She drove very little because "if I sit and drive . . ., I start burning real bad

in my shoulders" and "[m]y back hurts real bad."  (*Id*.).  She said the neck

surgery made her symptoms "worse;" she continues to have neck pain that

reaches into her shoulders and "down my arms into my hands," especially the

right wrist.  (Tr. 789).  She has "tingling sometimes," but mainly pain and

weakness, in her right hand.  (Tr. 789-90).  Holding things makes the hand pain

worse, and sometimes "I'll just drop" whatever she's holding.  (Tr. 791).  She can

use her right hand for "probably no more than five minutes" at a time.  (Tr. 792).

In addition, Plaintiff complained of back pain that is "always there." (*Id.*).
The pain was concentrated on her right side, and extended into her right hip and
leg, down into her feet. (Tr. 792-93). Her feet "tingle and go numb," and she
"ha[s] fallen due to my legs giving out, getting weak." (Tr. 793). A neurosurgeon
recently had told her "that there's really nothing they can do surgically for me,"
and had suggested "add[ing] an anti-inflammatory to my medicine." (*Id.*). She
had seen a rheumatologist for swelling in her knees and right ankle, as well as
swelling in her knuckles and elbows. (Tr. 793-94). He told her that she had
rheumatoid arthritis, and put her on Prednisone and Methotrexate. (Tr. 794).
Her family doctor was treating her for continued pain and swelling in the joints
of her hands and her knees, which the doctor believed was due to arthritis. (Tr.
794-95). Plaintiff's left knee caused problems "every day" with stair climbing.
(Tr. 795). "I have to sleep downstairs because I can't go up and down the stairs
because of my legs and my back." (*Id.*).

Plaintiff also has carpal tunnel syndrome in her left hand, and had carpal
tunnel surgery on her right, dominant hand in about 2001. (Tr. 787). Her left
hand "stay[ed] tingly and numb all the time." (*Id.*). Plaintiff said that she "can't
use [the left hand] at all right now because of the tingling and the numbness."
(Tr. 792). The surgery on her right hand "took the tingling away, but it made me

lose grip strength." (Tr. 787).  Her left hand was scheduled to have the same surgery the following month, in March 2005. (*Id.*).

Plaintiff testified that she also was on medication for depression and anxiety. (Tr. 787-88).  She saw a psychiatrist every three months and a counselor every two weeks. (Tr. 788).  They discussed ways to address her pain in order to relieve her depression. (*Id.*).  The medications for her psychological symptoms helped "[t]o a certain point," but she continued to experience some symptoms of depression. (Tr. 797).  For example, "I still think of suicide attempts sometimes," and "tell my husband I want to kill myself." (*Id.*).  She had crying spells "about once every two weeks." (*Id.*).  Plaintiff was hospitalized after a suicide attempt in June 2002. (Tr. 797-98).  She had undergone mental health treatment prior to that, but had stopped and then had to resume treatment. (Tr. 798).

Plaintiff testified that she no longer could do her previous component assembly job due to "[m]y fingers, sitting there, looking down at the board" (Tr. 795-96); "I wouldn't be able to hold my head down" to look at the parts. (Tr. 796).  She said that she could lift no more than five pounds without "feel[ing] the pain radiating in my shoulders and my legs and back." (*Id.*).  She could stand "maybe 20 minutes" before getting "real sharp pains in my legs and lower back," and could walk "probably a block" before "hurting real bad in my lower back,

my legs." (*Id*.). Sitting is "a real problem;" she proposed that she could sit no more than 10 to 15 minutes before "I start burning real bad in my shoulders." (Tr. 797). She could not hold her arms out to do work in front of her because "it would make my neck burn" and "cause the pain in my shoulders to get worse." (Tr. 792).

Brian Womer then testified as a vocational expert ["VE"]. (Tr. 798-805). He testified that Plaintiff's previous occupations all would be classified as either unskilled or semi-skilled, and either light or medium exertion, work. (Tr. 799). Asked by the ALJ about an individual with Plaintiff's characteristics able to perform light work with differing sets of limitations (*see* Tr. 800, 801), the VE testified that all of Plaintiff's past work would be ruled out. (Tr. 801, 802). However, such a person with the second set of limitations set forth by the ALJ (*see* Tr. 801) would be able to perform about 9,000 unskilled light jobs and about 3,000 unskilled sedentary jobs. (Tr. 802). An additional restriction to low stress jobs would reduce those numbers to about 6,000 and 1,500, respectively. (Tr. 802-03).

With the first set of hypothetical restrictions, the same numbers would be 6,000 unskilled light and 4,500 unskilled sedentary jobs without a "low stress" limitation (Tr. 801), and 3,000 and 1,500, respectively, with a "low stress"

limitation.  (Tr. 803).  Each of these jobs "would require someone to be looking down . . . at least 20 [to] 25 percent of the time (Tr. 805), so adding in a restriction of no looking up or down "would rule out" both the sedentary and light work. (Tr. 804-05).  Such entry-level jobs also would permit an employee to miss no more than two days per month.  (Tr. 805).

Following remand, Plaintiff testified at the second hearing that she had not worked since the full-time component assembly job described at the first hearing. (Tr. 1106).  That "was a sit-down job," but involved "using your hands and looking down constantly."  (*Id.*).  Prior to that, she had been a machine operator, a fast-food cashier and cook, and a nursing assistant in a hospital.  (Tr. 1106-09). She "tried" to get a GED, but "couldn't do it."  (Tr. 1109-10).

Plaintiff largely repeated her prior testimony regarding her neck, back and hand problems.  (Tr. 1110-11, 1114-15, 1115-16).  She said that she now also had chronic rheumatoid arthritis in "[a]ll of my joints" (Tr. 1111), for which she had been receiving IV infusions of Remicade every eight weeks, for almost a year. (Tr. 1112, 1116).  Her rheumatologist also prescribed Prednisone, Methotrexate and folic acid, which she had been taking for about three years, with no relief. (Tr. 1116-17).  She said that her pain level on a scale of one to 10 remained "about a nine at all times."  (Tr. 1117).  She also had acquired a hearing aid for her right

ear, but was supposed to have them for both ears.  (*Id*.).  For about six months, she had been seeing a new doctor for her psychological symptoms, because she was "starting to get really depressed and suicidal again."  (Tr. 1113).

Plaintiff testified that her hand problems now required her to wear slip-on shoes "because I can't tie my shoes."  (Tr. 1115).  "My hands are drawn up to where I can't hardly snap a button, I can't zip a pair of pants.  I can't hardly comb my own hair.  I can't grasp or hold cups, or anything like that."  (*Id*.).  On a typical day, she would get up at about 9:00 a.m. and "just sit around the house all day long."  (Tr. 1117-18).  "I don't do anything, I don't go anywhere.  If I move around I start hurting real bad, so I just . . . take my medicine and basically try to sit and lay down most of the day."  (Tr. 1118).  She testified that even with "sleeping medicine," she still awoke throughout the night.  (*Id*.).  She concluded by testifying that her problems have "gotten worse."  (*Id*.).

Plaintiff's testimony was followed by that of Hershel Goren, M.D., a neurologist testifying as an impartial medical expert.  (Tr. 1119-29).  Dr. Goren first summarized the medical evidence related to Plaintiff's physical impairments.  He clarified that Plaintiff's neck surgery was a one-level fusion at T-5 to T-6, not a two-level fusion as Plaintiff had claimed.  (Tr. 1119).  He opined

that a one-level fusion "would not significantly restrict range of motion of the cervical spine." (Tr. 1119-20).

Dr. Goren noted that a consultative orthopedist who examined Plaintiff in 2000 "found Waddell's tenderness sign, which is a sign of exaggeration." (Tr. 1120). A neurosurgeon also made notations in 2001 indicating exaggerated behavior (*id.*), and a treating anesthesiologist and a treating neurosurgeon made the same finding in 2004. (Tr. 1121). A rheumatologist also found in April 2003 that Plaintiff's symptoms were "disproportionately great in relation to the signs," meaning that "he thinks the claimant is exaggerating." (Tr. 1120). A family practitioner indicated in 2003 that Plaintiff is "narcotic-dependent" on Oxycontin, which Dr. Goren opined "would increase pain . . . cause pain in people who don't even [ ] have pain." (Tr. 1121).

Dr. Goren found no support in the record for Plaintiff's family practitioner's "conclusory statement" about marked difficulty with hand and foot controls (Tr. 1120), or for other family practitioners' indications that Plaintiff's exertional abilities were less than sedentary. (Tr. 1121, 1122). He noted that a consultative examination in 2007 was "essentially [ ] normal" except for "slightly decreased" range of motion of the spine, which Dr. Goren felt would not "make a functional difference." (Tr. 1122). He questioned another consultative

examiner's assessment of Plaintiff as being limited to sedentary work, noting that the examination was "essentially normal;" "I don't see the reason for [the sedentary] restriction."  (Tr. 1122, 1123).  Dr. Goren also testified that Plaintiff had not undergone sufficient testing to confirm a chronic obstructive pulmonary disease ["COPD"] diagnosis.  (Tr. 1124).  He concluded that Plaintiff did not meet or equal any listing from a physical standpoint.  (Tr. 1124).  Dr. Goren would restrict Plaintiff to lifting 20 pounds occasionally and 10 pounds frequently; no ladder, rope or scaffold climbing; occasional ramp or stair climbing; occasional stooping, kneeling, crouching or crawling; no unprotected heights; and avoiding concentrated fumes.  (Tr. 1124-25).

Dr. Mary Eileen Buban then testified as an impartial psychological expert. (Tr. 1129-38).  Based on her review of the record, she concluded that Plaintiff did not meet or equal any psychological listing.  (Tr. 1129).  She noted that Plaintiff had been diagnosed with a major depressive disorder, and had been hospitalized once for what was "described as a suicide attempt, but actually the claimant indicated she wasn't attempting suicide at that time."  (Tr. 1130).  The record revealed temporal "[f]inancial stressors, interpersonal stressors," including caring for a mother with Alzheimer's disease (*id.*), as well as "partner relationship problems."  (Tr. 1132).  An evaluation prepared in the context of a

workers' compensation case indicated that "they did not find the claimant to be a credible source of information," and that "there was no explanation for the reduction in function" claimed by Plaintiff.  (Tr. 1130-32).  "They felt malingering was what was perhaps to account for the difference in severity."  (Tr. 1132).  Dr. Buban also noted that Plaintiff "was not compliant with treatment."  (Tr. 1133).

In light of the Plaintiff's documented depressive disorder, Dr. Buban felt that a limitation to low-stress work would be appropriate (Tr. 1134), but only after October 18, 2004.  (Tr. 1134-35).  She also "would eliminate dealing with the public."  (*Id.*).  Dr. Buban noted that another psychology professional's opinion regarding greater restrictions was based on a combination of Plaintiff's psychological and pain symptoms.  (Tr. 1135).  Dr. Buban's opinion was directed toward Plaintiff's psychological limitations only.  (Tr. 1137).

Finally, Mark Pinti testified as a vocational expert ["VE"].  (Tr. 1138-42). Asked by the ALJ about a hypothetical individual with Plaintiff's characteristics, limited to lifting 20 pounds occasionally and 20 pounds frequently; no climbing of ladders, ropes or scaffolding; no unprotected heights; occasional use of ramps and stairs; occasional stooping, crawling and crouching; and no exposure to noxious fumes or chemicals, the VE testified that such a person could perform Plaintiff's past relevant work as a machine operator, electronics assembler, or fast

food worker. (Tr. 1138, 1139-40). Adding a limitation to simple, one-to-two step jobs in a low-stress work environment (*i.e.*, no dealing with the general public, no production standards, and no over-the-shoulder supervision), however, would eliminate those prior jobs. (Tr. 1140). Nevertheless, such a person could perform about 15,000 light, unskilled jobs and about 6,000 sedentary, unskilled jobs available in the region. (*Id.*).

Turning to the remaining information in the administrative record, the most significant evidence for purposes of the present case consists of medical records and the opinions of several medical sources relative to Plaintiff's work-related abilities. Because Plaintiff has not challenged the ALJ's findings regarding her psychological impairments (*see* Doc. #10), review will therefore focus on the medical evidence related to her physical conditions, summarized as follows.

*Grandview/Southview Hospitals* Plaintiff underwent neck surgery on January 14, 2000, involving "interbody fusion" at C5-6 and removal of a herniated disc that she attributed to a work-related injury. (Tr. 550-54). No complications were noted, and Plaintiff reported the next day that her arm pain "had greatly improved." (Tr. 550). A myelogram performed in March 2000 showed an "anterior extradural defect" at C5-6 as well as at other cervical levels, with some

bilateral effacement of the exiting nerve root bilaterally at C5-6 and to a lesser degree at the C4-5 level.  (Tr. 564-65).

*Rudolf Hofmann, M.D.*  On June 16, 2000, Dr. Hofmann, an independent orthopedic evaluator, examined Plaintiff relative to her workers' compensation claim.  (Tr. 566-74).  Dr. Hofmann noted that Plaintiff exhibited diffuse tenderness throughout the cervical, thoracic, and lumbar spine.  (Tr. 568).  Her range of motion in the cervical spine was "painfully limited" to 35 degrees flexion, with limits also noted in extension, side bending, and rotation.  (Tr. 569).  She had decreased range of motion in the lumbar spine as well.  (*Id.*).  Straight leg raising caused low back pain at 30 degrees bilaterally.  (*Id.*).  Plaintiff also reported a diagnosis of carpal tunnel syndrome, and Dr. Hofmann noted that Tinel's test was positive over the carpal tunnel and pinch strength was weak on the right, consistent with carpal tunnel syndrome.  (Tr. 572).  Dr. Hofmann indicated that an EMG confirmed carpal tunnel syndrome.  (*Id.*).

Based solely on the limitations related to her cervical impairment (and not carpal tunnel syndrome), Dr. Hofmann indicated that Plaintiff should not lift more than 10 pounds occasionally or five pounds frequently.  While she could stand or sit up to six hours a day each, she could not do so for more than one hour at a time and she would need to be able to "get up and move about

intermittently at her own discretion." (Tr. 573). Dr. Hofmann noted that Plaintiff should not bend, squat, crawl, climb or reach more than occasionally. (*Id.*).

_John K. Wiley, M.D._ Dr. Wiley, a neurosurgeon, examined Plaintiff on May 17, 2001, apparently on referral from Plaintiff's primary care doctor. (Tr. 575). Dr. Wiley reported that when Plaintiff showed "poor cooperation" and complained of pain upon strength testing, Plaintiff's husband "essentially demanded that the examination be halted." (Tr. 576). As Plaintiff's examination was essentially normal, Dr. Wiley "did not find a surgical cause for her pain." (*Id.*). However, he noted that Plaintiff's husband expressed their mutual objection to physical therapy, and "[t]he patient and her husband left angrily," apparently seeking "someone who will perform an operation." (*Id.*).

_W. Jerry McCloud, M.D._ Dr. McCloud, a state agency physician, reviewed Plaintiff's records in November 2002. (Tr. 309-14). He noted that Plaintiff had a "[l]ong history of back pain" despite "repeatedly normal neurological exam," and that MRIs showed "age-related changes but are otherwise within normal limits. (Tr. 311). He concluded that Plaintiff could perform a full range of medium work. (Tr. 311-13).

_Jeffrey A. White, M.D._ Dr. White, a family practitioner, first saw Plaintiff on December 10, 2002. (Tr. 393-94). On December 28, 2002, he completed a medical

questionnaire, indicating that Plaintiff had a chronic pain disorder secondary to cervical radiculopathy and degenerative joint disease of the neck, along with depression and anxiety. (Tr. 395). He opined that Plaintiff could not walk or stand for more than four hours in an eight-hour day, and could do so for only one-half hour at a time. (Tr. 396). He also thought that Plaintiff could sit for no more than four hours in an eight-hour workday, for only one-half hour at a time, and could lift or carry no more than six to 10 pounds occasionally or five pounds frequently. (*Id.*). He concluded that she was "unemployable." (*Id.*).

On March 3, 2003, Dr. White reported that Plaintiff had newly diagnosed rheumatoid arthritis in addition to cervical disc disease and a history of cervical spinal surgery. (Tr. 360). He noted that Plaintiff had no sensory deficits, but that her muscle testing was affected by her inflammation. (*Id.*). Dr. White noted that Plaintiff walked with a limp, had swelling in her left elbow, and had a limited range of motion in her right knee, elbows, back and shoulder. (*Id.*).

*Michael Reynolds, M.D.* Dr. Reynolds, a rheumatologist, saw Plaintiff on referral from Dr. White. (Tr. 315). Upon examining Plaintiff in early February 2003, he noted that "[s]pontaneous movements of the neck and back are limited." (Tr. 316). He also noted tenderness and swelling in some fingers and the left elbow, with accompanying limitation of motion. (*Id.*). Dr. White diagnosed

arthritis of the left elbow and right ankle, but noted no synovitis in Plaintiff's hands, despite symptoms suggesting arthritis.  (Tr. 317).  In follow up two weeks later, Dr. Reynolds noted swelling in five joints, but observed that Plaintiff satisfied only three criteria for rheumatoid arthritis.  (Tr. 700).  He diagnosed "[p]olyarthritis, active," and signs consistent with left carpal tunnel syndrome.  (*Id.*).  He prescribed Methotrexate and Prednisone.  (*Id.*).

In April 2003, Plaintiff's left elbow continued to be moderately swollen and she had painful full flexion at the wrists.  (Tr. 698).  Dr. Reynolds commented that Plaintiff's symptoms were "disproportionately great in relation to signs."  (*Id.*).

*Jocelyn M. Wray, M.D.*  Dr. Wray, a specialist in physical medicine and rehabilitation, examined Plaintiff in March 2003.  (Tr. 319-20).  Plaintiff exhibited "pain behaviors" as well as decreased range of motion throughout the lumbar spine, and "[c]ervical range of motion was slightly limited and painful as well."  (Tr. 319).  Pain appeared in only two fibromyalgia tender points.  (*Id.*).  Dr. Wray diagnosed polyarthritis, chronic neck and low back pain, and significant depression and anxiety.  (Tr. 320).  She recommended "a specific and limited course of physical therapy."  (*Id.*).

*Robert E. Norris, M.D.*  Dr. Norris, another state agency physician, reviewed Plaintiff's medical records in April 2003, and opined that Plaintiff could perform

light work, with only occasional stooping and no crawling or climbing ladders, ropes, or scaffolds. (Tr. 323-24).

In June 2003, Dr. Norris re-evaluated Plaintiff's claim in light of *Drummond v. Comm'r of Soc. Sec.*, 126 F.3d 837 (6th Cir. 1997), and adopted the residual functional capacity finding of the ALJ who adjudicated Plaintiff's earlier applications for benefits. (Tr. 351-55; *see* Tr. 45-63). Consistent with the May 10, 2002 decision, Dr. Norris concluded that Plaintiff could lift up to five pounds frequently and 10 pounds occasionally; sit one hour at a time and six hours during a workday; stand and walk one hour at a time up to four hours during a workday; could not push or pull arm controls; could occasionally climb ramps and stairs, stoop, kneel, and crouch; could not reach above shoulder level; could never crawl or climb ladders, ropes, or scaffolds; and would need to avoid exposure to vibrations and hazards. (Tr. 354-55).[3]

*Townsend Smith, M.D.* In March 2004, Dr. Smith, a pain specialist, noted on examination that "[r]ange of motion aggravates pain in the cervical neck as well as the elbows and hands." (Tr. 533). Diffuse pain of the lower extremities occurred with all types of movement as well. (*Id.*). Dr. Smith concluded that

---

[3]As Defendant notes (*see* Doc. #15 at 4, n.1), Plaintiff does not argue that the the *Drummond* doctrine bound ALJ Shell to adopt ALJ's Knapp's earlier residual functional capacity finding.

Plaintiff suffered from fibromyalgia in addition to her cervical and lumbar problems.  Dr. Smith affirmed to the treating physician, Dr. Adams, that chronic opioids could be used to treat Plaintiff's chronic pain, along with a muscle relaxer, medication for neuropathic pain, and Elavil.  (Tr. 531-32).

_Rebecca Adams, M.D._  In September 2004, Dr. Adams, Plaintiff's treating physician, noted 14 out of 18 positive tender points on examination, indicative of fibromyalgia.  (Tr. 714).  In 2005, Dr. Adams indicated that Plaintiff should not lift more than 10 pounds because of her impairments.  (Tr. 728-29).  Dr. Adams thought that Plaintiff could not stand or walk for six hours a day, and could sit for only about four to six hours a day.  (Tr. 729).  Dr. Adams indicated that Plaintiff's ability to perform postural activities would be limited to occasionally.  Dr. Adams also indicated that Plaintiff would have difficulty reaching and pushing or pulling.  (Tr. 730).  Dr. Adams noted that Plaintiff likely would miss more than three days of work each month due to her impairments.  (Tr. 732).

_Roger Griffin, M.D._  Dr. Griffin, a rheumatologist, began treating Plaintiff in May 2005.[4]  (Tr. 936).  Dr. Griffin diagnosed rheumatoid arthritis ["RA"] in addition to degenerative joint disease ["DJD"].  Examination showed problems with the left knee, but Dr. Griffin attributed this to osteoarthritis (mechanical)

---

[4]Although treatment notes indicate that this was a "[r]evisit," this represents the first note from Dr. Griffin in the record.

rather than inflammatory arthritis.  Examination also showed positive active synovitis in the small joints of the fingers and hands ["MCPs," "PIPs"].[5]  Dr. Griffin recommended that Plaintiff continue on Plaquenil.  (Tr. 936).

In 2006, Plaintiff reported increased problems with joint pain and felt that Plaquenil no longer was working.  Examination showed decreased range of motion in the shoulder.  (Tr. 933).  Dr. Griffin substituted Prednisone for Plaquenil.  (Tr. 931).  When Plaintiff's laboratory test numbers stabilized, he put her on Methotrexate ["MTX"].  (*Id.*).  In November 2006, although Plaintiff reported improvement with Prednisone and Methotrexate, her knee continued to be very sore and stiff.  Dr. Griffin's assistant increased the Methotrexate and continued the Prednisone.  (Tr. 928).

In February 2007, Plaintiff reported increased pain.  Examination was positive for synovitis in the right foot and knee.  Methotrexate again was increased.  (Tr. 927).  By March 2007, only mild swelling and tenderness of the PIP joints remained.  Dr. Griffin thought that the rheumatoid arthritis was becoming well controlled on Methotrexate.  (Tr. 919).

---

[5]The "PIP" (proximalinterphalangeal) joint is located between the proximal and intermediate phalanges.  The "MCP" (metacarpophalangeal) joint is between the metacarpals and proximal phalanges.  *See* http://en.wikipedia.org/wiki/File:Scheme_human_hand_bones-en.svg.

By May 2007, however, active synovitis again appeared in the right MCPs, and Dr. Griffin recommended an increase in Methotrexate. (Tr. 1036). In June 2007, Plaintiff complained of increased pain in her right hand and wrist as well as her knees. Range of motion of the wrist was limited in extension and extension of the knees produced pain. (Tr.1031). Dr. Griffin again increased Plaintiff's Methotrexate dosage. (Tr. 1032). On July 19, 2007, Dr. Griffin indicated that Methotrexate and Prednisone had failed to relieve Plaintiff's symptoms and she continued to have severe synovitis. He recommended Remicade injections. (Tr. 1030, 1033).

In August 2007, Plaintiff indicated that her pain was a "7/10." She complained of stiffness in her joints that caused problems with holding objects and writing. Her insurance carrier finally had approved payment for Remicade treatments. (Tr. 1029). On August 30, 2007, Dr. Griffin indicated that examination showed severe synovitis in the hands, and Remicade infusion was begun. (Tr. 1028). Two months later, significant active synovitis still remained. Remicade was continued. (Tr. 1026).

In December 2007, Plaintiff reported that the Remicade infusion eight weeks prior had helped a lot at first, but slowly wore off. She still was somewhat better, but examination continued to show swelling in her hand. (Tr. 1025). A

scheduling error forced her next dose of Remicade to be delayed.  (*Id.*).  By the time Plaintiff received an infusion three weeks later, her symptoms had flared again, and Dr. Griffin again noted severe active synovitis.  (Tr. 1024).  At the end of February 2008, Dr. Griffin again noted that Plaintiff's rheumatoid arthritis remained severe, with severe active synovitis.  Plaintiff underwent another Remicade infusion.  (Tr. 1023).  In April 2008, Plaintiff reported that the positive effects of the last Remicade infusion lasted only 12 days.  Dr. Griffin again noted severe active synovitis and again infused Remicade.  (Tr. 1022).

On August 7, 2008, Dr. Griffin's records continued to show active disease, with severe active synovitis of the PIP, MCP and wrist joints.  (Tr. 1051).

*Richard Hutson, M.D.*  On June 6, 2005, Dr. Hutson reviewed Plaintiff's file and completed medical interrogatories indicating that Plaintiff could perform a "full line of sedentary work."  (Tr. 735-36).

*Damian M. Danopulos, M.D.*  Dr. Danopulos evaluated Plaintiff on July 9, 2007, at the request of the State agency.  (Tr. 938-48).  Dr. Danopulos indicated that examination showed painful but full range of motion in all extremities.  (Tr. 940).  He saw no evidence of joint abnormalities such as heat, redness, swelling, or synovial thickening.  (Tr. 941).  Range of motion indicated to be "normal" for all hand and finger joints.  (Tr. 945).  Dr. Danopulos noted that range of motion of

the cervical and lumbar spine were restricted and painful. A straight leg raising test was positive at 70 degrees. (Tr. 941). X-rays of the lumbar spine showed mild degenerative changes from L4 to S1. (Tr. 941, 947). Dr. Danopulos concluded that Plaintiff's "ability to do any work-related activity is affected in a negative way from her early emphysema, her arthralgias which are triggered from her rheumatoid arthritis which has been treated properly with Methotrexate and Prednisone, her cervical spine chronic pain and LS spine early arthritis." (Tr. 942).

_Stephen W. Duritsch, M.D._  Dr. Duritsch evaluated Plaintiff on July 16, 2008, at the request of the Ohio BDD. (Tr. 984-96). Dr. Duritsch observed a slight swelling of the PIP joints of the hands bilaterally, but otherwise saw no evidence of rheumatoid arthritis. (Tr. 985). Dr. Duritsch noted some decrease in cervical range of motion. (Tr. 985, 988). Range of motion of the lumbar spine also was reduced. (Tr. 989). Dr. Duritsch felt that Plaintiff could use her upper limbs only occasionally due to her rheumatoid arthritis and history of carpal tunnel syndrome. (Tr. 985).[6]

Specifically, Dr. Duritsch indicated that Plaintiff only occasionally could reach, handle, finger, feel, and push/pull. (Tr. 993). Dr. Duritsch saw no

---

[6]Plaintiff reported to Dr. Duritsch that she underwent carpal tunnel release in 2005. (Tr. 984).

limitation on Ms. Dugan's ability to sit, but noted that she could stand or walk for only one hour at a time. He indicated that Plaintiff could stand for only two to three hours and walk for only one to two hours total in an eight-hour workday. (Tr. 992). Dr. Duritsch thought that Ms. Dugan could lift no amount frequently and up to 20 pounds only occasionally. (Tr. 991).

## III. THE "DISABILITY" REQUIREMENT & ADMINISTRATIVE REVIEW

### A. Applicable Standards

The Social Security Administration provides benefits to individuals who are under a "disability," among other eligibility requirements. *Bowen v. City of New York*, 476 U.S. 467, 470 (1986); *see* 42 U.S.C. § 423(a)(1)(D). The term "disability" – as defined by the Social Security Act – has specialized meaning of limited scope. It encompasses only those who suffer from a medically determinable physical or mental impairment severe enough to prevent them from engaging in substantial gainful activity. *See* 42 U.S.C. § 423(d)(1)(A); *see also Bowen*, 476 U.S. at 469-70. An applicant bears the ultimate burden of establishing that he or she is under a "disability." *See Key v. Callahan*, 109 F.3d 270, 274 (6th Cir. 1997); *see Wyatt v. Sec'y of Health & Human Servs.*, 974 F.2d 680, 683 (6th Cir. 1992); *see also Hephner v. Mathews*, 574 F.2d 359, 361 (6th Cir. 1978).

Social Security Regulations require ALJs to resolve a disability claim through a five-Step sequential evaluation of the evidence. (*See* Tr. 13-15); *see also*

20 C.F.R. § 404.1520(a)(4).  Although a dispositive finding at any Step terminates the ALJ's review, *see Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007), if fully considered, the sequential review considers and answers five questions:

1.  Is the claimant engaged in substantial gainful activity?

2.  Does the claimant suffer from one or more severe impairments?

3.  Do the claimant's severe impairments, alone or in combination, meet or equal the criteria of an impairment set forth in the Commissioner's Listing of Impairments, 20 C.F.R. Subpart P, Appendix 1?

4.  Considering the claimant's residual functional capacity, can the claimant perform his or her past relevant work?

5.  Considering the claimant's age, education, past work experience, and residual functional capacity, can the claimant perform other work available in the national economy?

*See* 20 C.F.R. § 404.1520(a)(4); *see also Colvin*, 475 F.3d at 730; *Foster v. Halter*, 279 F.3d 348, 354 (6th Cir. 2001).

**B.**  **The ALJ's Decision**

At Step 1 of the sequential evaluation, ALJ Shell found that Plaintiff met the insured status requirements of the Act through June 30, 2004.  (Tr. 826).  The ALJ also found that Plaintiff had not engaged in substantial gainful activity since May 12, 2002.  (*Id.*).

The ALJ found at Step 2 that Plaintiff has the severe impairments of degenerative disc disease of the cervical spine, mild degenerative disc disease of the lumbar spine, osteoarthritis, mild chronic obstructive pulmonary disease, and depressive and pain disorders. (*Id.*). The ALJ determined at Step 3 that Plaintiff does not have an impairment or combination of impairments that meets or equals the level of severity described in Appendix 1, Subpart P, Regulations No. 4. (Tr. 827).

At Step 4, the ALJ found that Plaintiff retained the residual functional capacity ["RFC"] to perform a limited range of light work, including no climbing of ladders, ropes, or scaffolds; only occasional stopping, crawling, crouching, and using ramps and stairs; no exposure to noxious fumes or chemicals, and only simple, one- and two-step tasks that are considered to be low-stress (*i.e.*, no direct dealing with the general public, no production quotas, and no close "over-the-shoulder" supervision). (Tr. 829). The ALJ then found that Plaintiff is unable to perform any of her past relevant work. (Tr. 833).

Nevertheless, the ALJ found at Step 5 that Plaintiff remained capable of performing jobs that exist in significant numbers in the national economy. (*Id.*). This assessment, along with the ALJ's findings throughout his sequential

evaluation, ultimately led him to conclude that Plaintiff was not under a disability and hence not eligible for DIB or SSI benefits. (Tr. 32).

## IV.   JUDICIAL REVIEW

Judicial review of an ALJ's decision proceeds along two lines: "whether the ALJ applied the correct legal standards and whether the findings of the ALJ are supported by substantial evidence." *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (6th Cir. 2009); *see Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 745-46 (6th Cir. 2007).

Review for substantial evidence is not driven by whether the Court agrees or disagrees with the ALJ's factual findings or by whether the administrative record contains evidence contrary to those factual findings. *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007); *see Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 389-90 (6th Cir. 1999). Instead, the ALJ's factual findings are upheld if the substantial-evidence standard is met – that is, "if a 'reasonable mind might accept the relevant evidence as adequate to support a conclusion.'" *Blakley*, 581 F.3d at 407 (quoting *Warner v. Comm'r of Soc. Sec.*, 375 F.3d 387, 390 (6th Cir. 2004). Substantial evidence consists of "more than a scintilla of evidence but less than a preponderance . . ." *Rogers*, 486 F.3d at 241.

The second line of judicial inquiry, reviewing for correctness the ALJ's legal criteria, may result in reversal even if the record contains substantial evidence supporting the ALJ's factual findings.  *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 651 (6th Cir. 2009); *see Bowen*, 478 F.3d at 746.  "[E]ven if supported by substantial evidence, 'a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.'" *Rabbers*, 582 F.3d at 651 (quoting in part *Bowen*, 478 F.3d at 746, and citing *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 546-47 (6th Cir. 2004)).

## V.   DISCUSSION

### A.   The Parties' Contentions

Plaintiff raises three issues in her Statement of Errors.  (Doc. #10).  She first contends that the ALJ erred by failing to provide any reason for rejecting treating and other medical source opinions in the record.  (Tr. 10 at 1, 13-16).  Specifically, she purports that ALJ Shell improperly failed to address the opinions of Drs. Hoffman, White, Adams and Hutson.  (*Id.* at 13-14).  Next, asserting that she is "more limited in her manipulative ability than found by" the ALJ (*id.* at 16), Plaintiff argues that the ALJ erred by relying on Dr. Goren's expert opinion without taking into account her treating rheumatologist's records or Dr. Duritsch's opinion concerning her manipulative limitations.  (*Id.* at 1, 16-17).

Finally, Plaintiff asserts the ALJ erred by failing to elicit an explanation from the vocational expert of alleged conflicts between his testimony and information contained in the Dictionary of Occupational Titles ["DOT"].  (*Id.* at 1, 18-19).  She urges that remand is necessary in order to address these alleged errors.  (*Id.* at 20).

In opposing Plaintiff's claims, the Commissioner in essence argues that any oversight in the ALJ's handling of medical source opinions was harmless error.  (Doc. #15 at 11-16).  Defendant further asserts that any evidence suggesting greater limitations on Plaintiff's manipulative abilities does not undermine the medical expert's well-supported testimony.  (*Id.* at 16-17).  As to Plaintiff's final allegation, Defendant again contends that any such error was harmless "because there is no conflict" between the VE's testimony and the DOT.  (*Id.* at 17-18).  He thus urges that remand "would be an idle and useless formality."  (*Id.* at 18).

### B. <u>Medical Source Opinions</u>

#### 1. *Treating Medical Sources*

Key among the standards to which an ALJ must adhere is the principle that greater deference generally is given to the opinions of treating medical sources than to the opinions of non-treating medical sources.  *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 242 (6th Cir. 2007); *see* 20 C.F.R. § 404.1527(d)(2).  This is so, the Regulations explain, "since these sources are likely to be the medical

professionals most able to provide a detailed, longitudinal picture of [a DIB

claimant's] medical impairment(s) and may bring a unique perspective to the

medical evidence that cannot be obtained from the objective medical findings

alone or from reports of individual examiners, such as consultative examinations

or brief hospitalizations . . ."  20 C.F.R. § 404.1527(d)(2); *see also Rogers*, 486 F.3d at

242.  In light of this, an ALJ must grant controlling weight to a treating source's

opinion when it is both well supported by medically acceptable data and not

inconsistent with other substantial evidence of record.  *Rogers*, 486 F.3d at 242; see

*Wilson*, 378 F.3d at 544; *see also* 20 C.F.R. § 404.1527(d)(2).

If either of these attributes is missing, the treating source's opinion is not

deferentially due controlling weight, *Rogers*, 486 F.3d at 242; *see Wilson*, 378 F.3d

at 544, but the ALJ's analysis does not end there.  Instead, the Regulations create

a further mandatory task for the ALJ:

> Adjudicators must remember that a finding that a
> treating source medical opinion is not well-supported
> by medically acceptable [data] . . . or is inconsistent with
> other substantial evidence in the case record means only
> that the opinion is not entitled to 'controlling weight,'
> not that the opinion should be rejected . . .

Social Security Ruling 96-2p, 1996 WL 374188, at *4.  The Regulations require the

ALJ to continuing the evaluation of the treating source's opinions by considering

"a host of other factors, including the length, frequency, nature, and extent of the

treatment relationship; the supportability and consistency of the physician's conclusions; the specialization of the physician; and any other relevant factors." *Rogers*, 486 F.3d at 242; *see Wilson*, 378 F.2d at 544.

"[I]n all cases there remains a presumption, albeit a rebuttable one, that the opinion of a treating physician [or psychologist] is entitled to great deference, its non-controlling status notwithstanding." *Rogers*, 486 F.3d at 242.

### 2. *Non-Treating Medical Sources*

The Commissioner views non-treating medical sources "as highly qualified physicians and psychologists who are experts in the evaluation of the medical issues in disability claims under the [Social Security] Act." Social Security Ruling 96-6p, 1996 WL 374180, at *2. Yet the Regulations do not permit an ALJ to automatically accept (or reject) the opinions of a non-treating medical source. *See id*., at *2-*3. The Regulations explain, "In deciding whether you are disabled, we will always consider the medical opinions in your case record together with the rest of the relevant evidence we receive." 20 C.F.R. § 404.1527(b). To fulfill this promise, the Regulations require ALJs to evaluate non-treating medical source opinions under the factors set forth in § 404.1527(d) including, at a minium, the factors of supportability, consistency and specialization. *See* 20 C.F.R. § 404.1527(f); *see also* Ruling 96-6p, at *2-*3.

C.      **Analysis**

Plaintiff's first allegation of error implicates 20 C.F.R. § 404.1527(d)'s

provisions for the handling of medical source opinions.  Careful review of the

ALJ's most recent decision (Tr. 814-35) confirms that ALJ Shell did not discuss

Dr. White's 2002 opinion that Plaintiff was "unemployable" due to numerous

physical limitations.[7]  (*See* Tr. 395-96).   "A court cannot excuse the denial of a

mandatory procedural requirement protection simply because, as the

Commissioner urges, there is sufficient evidence in the record for the ALJ to

discount the treating source's opinion and, thus, a different outcome on remand

is unlikely."  *Wilson*, 378 F.3d at 546.  The Court in *Wilson* continued:

> '[A] procedural error is not made harmless simply
> because the [aggrieved party] appears to have had little
> chance of success on the merits anyway.'  To hold
> otherwise, and to recognize substantial evidence as a
> defense to non-compliance with § 1527(d)(2), would
> afford the Commissioner the ability to violate the
> regulation with impunity and render the protections
> promised therein illusory.  The general administrative
> law rule, after all, is for a reviewing court, in addition to
> whatever substantive factual or legal review is
> appropriate, to 'set aside agency action . . . found to be .
> . . without observance of procedure required by law.'

*Id.* (internal citations omitted).

---

[7](*See also* Doc. #15 at 13) (where the Commissioner concedes that "the ALJ did not
specifically address Dr. White's opinion").

Although the Commissioner urges that Dr. White's opinion "was so patently deficient that no ALJ reasonably could have credited it" (Doc. #15 at 13), *see Wilson*, 378 F.3d at 547, omission of Dr. White's opinion cannot be readily so excused here.  Even had the ALJ set forth reasons as to why that opinion was not due controlling weight,

> the ALJ, in determining how much weight is appropriate, must consider a host of factors, including the length, frequency, nature, and extent of the treatment relationship; the supportability and consistency of the physician's conclusions; the specialization of the physician; and any other relevant factors . . .  However, **in all cases there remains a presumption, albeit a rebuttable one, that the opinion of a treating physician is entitled to great deference, its non-controlling status notwithstanding** . . .

*Rogers*, 486 F.3d at 242 (emphasis added) (citation omitted).; *see also* Social Security Ruling 96-2p, 1996 WL 374188, at *4 .  The Sixth Circuit recently issued a "modest reminder" reaffirming the importance of such continued weighing.  *See Blakley*, 581 F.3d at 409.

Here, not only did the ALJ conduct no analysis at all of Dr. White's opinion, but he also neglected to consider Dr. Hoffman's opinion (*see* Tr. 566-74) subject to the appropriate regulatory factors.  As to this omission, too, Defendant implicitly concedes that the ALJ erred, but again maintains that it was not "reversible error."  (Doc. #15 at 11).  And the Commissioner advances the same

argument yet again as to the ALJ's handling of Dr. Hutson's opinion (*see* Tr. 735-36), urging that such opinion is "of little probative value and the ALJ's failure to weigh it was not reversible error." (*Id.* at 12).

Even setting aside the additional argument as to whether or not the ALJ's rejection of Dr. Adams' opinion was supported by substantial evidence (*see* Doc. #10 at 13-14; Doc. #15 at 12-13; Doc. #16 at 3), this Court is confronted with a case in which the Commissioner effectively admits that the ALJ committed legal error in his handling of three different physicians' opinions, but nonetheless asks this Court to sustain the ALJ's decision. Despite the Commissioner's characterization, the Court cannot agree that ALJ's errors in those multiple respects were harmless. Although the ALJ's oversight as to any one of those opinions, standing alone, might not suffice to doom his decision, the cumulative effect of completely ignoring three opinions favorable to Plaintiff seems to this Court to surpass any feasible standard of "harmlessness." *See Bowen*, 478 F.3d at 747-48; *Wilson*, 378 F.3d at 546-47.

Plaintiff's challenge to the ALJ's evaluation of the medical source opinions therefore is well taken. Having so determined, the Court need not address Plaintiff's additional allegations of error.

### D.  <u>Award or Remand</u>

If an ALJ failed to apply the correct legal standards or his factual conclusions are not supported by substantial evidence, the Court must decide whether to remand the case for rehearing or to reverse and order an award of benefits.  Under Sentence 4 of 42 U.S.C. § 405(g), the Court has authority to affirm, modify, or reverse the Commissioner's decision "with or without remanding the cause for rehearing."  *Melkonyan v. Sullivan*, 501 U.S. 89, 99 (1991). Remand is appropriate if the Commissioner applied an erroneous principle of law, failed to consider certain evidence, failed to consider the combined effect of impairments, or failed to make a credibility finding.  *Faucher v. Sec'y of Health & Human Servs.*, 17 F.3d 171, 176 (6th Cir. 1994).

In light of the finding that the ALJ made an error of law, remand of this matter to the Social Security Administration pursuant to Sentence 4 of § 405(g) is appropriate, to permit the ALJ to reassess Plaintiff's residual functional capacity. On remand, the ALJ should be directed (1) to re-evaluate the medical source opinions of record under the legal criteria set forth in the Commissioner's Regulations, Rulings, and as required by case law; and (2) to reconsider, under the required sequential evaluation procedure, whether Plaintiff was under a disability and thus eligible for SSI.  Accordingly, the case should be remanded to

the Commissioner and the ALJ for further proceedings consistent with this

Report and Recommendations.

      IT THEREFORE IS **RECOMMENDED** THAT:

1.      The Commissioner's nondisability decision be VACATED;

2.      No finding be made as to whether Plaintiff Dorothy Dugan was under a "disability" within the meaning of the Social Security Act;

3.      This case be REMANDED to the Commissioner and the Administrative Law Judge under Sentence Four of 42 U.S.C. § 405(g) for further consideration consistent with this Report; and

4.      The case be TERMINATED on the docket of this Court.


July 23, 2010                                s/Sharon L. Ovington    
                                            Sharon L. Ovington
                                   United States Magistrate Judge

## NOTICE REGARDING OBJECTIONS

Pursuant to Fed. R. Civ. P. 72(b), any party may serve and file specific, written objections to the proposed findings and recommendations within fourteen (14) days after being served with this Report and Recommendations. Pursuant to Fed. R. Civ. P. 6(d), this period is extended to seventeen (17) days because this Report is being served by one of the methods of service listed in Fed. R. Civ. P. 5(b)(2)(C), (D), (E), or (F).  Such objections shall specify the portions of the Report objected to and shall be accompanied by a memorandum of law in support of the objections.  If the Report and Recommendations are based in whole or in part upon matters occurring of record at an oral hearing, the objecting party shall promptly arrange for the transcription of the record, or such portions of it as all parties may agree upon or the Magistrate Judge deems sufficient, unless the assigned District Judge otherwise directs.  A party may respond to another party's objections within fourteen (14) days after being served with a copy thereof.

Failure to make objections in accordance with this procedure may forfeit rights on appeal.  *See Thomas v. Arn,* 474 U.S. 140 (1985); *United States v. Walters,* 638 F.2d 947 (6th Cir. 1981).